in Case 23-825, Deligatti v. United States. Mr. Keatum. Mr. Chief Justice, and may it please the Court, using physical force against another requires taking some step to bring force into contact with the victim. That can happen directly, as with a kick or punch, or indirectly, such as giving a gentle push to someone teetering on the edge of a cliff. But it does not involve an offense that can be committed by pure omission, such as failing to render aid to someone suffering from a natural disorder. The government's attempt to reverse-engineer the use of force from the presence of injury is contrary to logic and plain meaning. It also runs counter to this Court's instructions that use means an active employment, that physical force is violent force, and that against another means making contact with another. The government's appeal to practical consequences, in addition to being irrelevant to interpreting the statute's text, is similarly unpersuasive. At the time the elements clause was adopted, all or nearly all of the statutes identified by the government would have satisfied the residual clause. And per the government's hedging here, many will satisfy the elements clause too, regardless of whether crimes of omission are excluded. A failure to counteract harm may be morally and legally culpable, and it may merit severe punishment, but it does not categorically involve the use of violent physical force against another. I would welcome the Court's questions. So in your thinking, if you poison someone and thereby cause the death of that person, that is, in your argument, under your argument, treated differently from withholding critical, say, heart medicine when someone is in the process of having a heart attack. That's correct, Your Honor. So this Court has described poison as having forceful physical properties that you would have put into contact with the victim by putting it in their drink. That's a very different situation than someone who, potentially through natural causes, slips into distress, and you don't take any action to put them into contact with any force, and there may not be any force involved if, for instance, it's a congenital disorder. So there's no force at all, and you wouldn't have used that force actively. I'm sorry. I don't know. You almost seem to be talking proximate cause. There's no force in the poison itself, and what you did, the force is in the nature of the substance that goes through the person's body. Similarly, there's no violent force in a gentle push of a 90-year-old down the stairs. You could probably do it with a finger. So there's no violent force there. What you seem to be saying is if I have a duty to act and I choose not to, I'm not responsible for the force that I let work on this human being. That's your position, correct? No, Your Honor. So in both the poisoning example and giving a gentle push to someone who falls down the stairs or off of a cliff, you are not directly applying violent physical force. It's a gentle touch, or you're just letting the molecules of the poison fall from your hand. But there is still an application of violent physical force when they hit the ground at high speed. Well, I would tell someone who's freezing in the snow that there's an application of winter conditions to their body to kill them. Sure. And in that instance, again, you might describe the elements as involving violent physical force, which perhaps you could describe as using indirectly if, for instance, you throw them out into the snow. But that's a very different situation than a pure omission where someone, let's say, has an allergic reaction. It's not a pure omission. It's an obligation to act.  I mean, to be in a restaurant watching someone die, but I have no obligation, even if I know the Heimlich maneuver to do it. However, if it's a child and my child, I have an obligation to try to save them. That's correct. And it is a serious offense. But I'm letting nature use its force to kill that child. So there's no dispute that it is criminally culpable behavior and can be punished severely. But the question is, is there violent force being applied to the victim? And have you actively employed that force? And in a situation where, for instance, you just don't provide medicine or nutrition to someone and they slowly expire, there is no violent physical force of any sort. It's not like hitting the ground at high speed. And moreover, you haven't taken any step to actively employ any force. I guess I'm not sure I get that. In the poison case, you're agreeing that it's not my putting the poison into the drink that's violent physical force. Rather, it's the way the poison acts on the body. And in the withholding of medication situation, it's similarly the way the disease acts against the body. And you're enabling that disease to run. So I think this Court has analogized poison to sort of like a little explosive device that detonates when you swallow it. I don't think the same is true, for instance, to just the absence of chemical inputs as necessary to keep your cells going. That's not analogous to violent physical force. And even in the poisoning example, you are still taking some step to bring the person into contact with that poison, without which they wouldn't have the force applied to them at all, even indirectly. So if I take a hostage and then just let the hostage starve, which side of the line does that fall on for you? So putting aside that that would probably be a threat or, you know, attempt to use force. Physical force, just physical force. So let's say there was someone sleeping in a room and you lock them in the room, and then they slowly expire. From our perspective, that would not involve application of violent physical force. And you could say you use the locks, but you haven't actually used force against them. Well, what do you do with the fact that Stoeckling, especially, seems to measure force not from the front end, like force applied, but from the back end on what is its result? It seems to me that for murder, necessarily, the result was pretty extreme. So respectfully, I don't think Stoeckling takes that position. In fact, the whole discussion in Stoeckling was, how much force do you need to apply? What's the amount of force to overcome resistance? Which, again, the court wasn't focused on whether the person was injured or not. It was, can you do it just sort of by gently grabbing it, or does it need to be more vigorous? But the measure of the force, if you're prying someone's fingers off of a purse, I mean, the measure of force, I wouldn't describe that as severe or aggressive. So then that was the back and forth, but everyone was focused on that same question. So they were still focused on how much force was involved. You look also, for instance, at Castleman. So Castleman gives the example of a squeeze of an arm that causes a bruise, which the court said would count as common law force for purposes of domestic violence, but would not count as violent force for generic purposes, which shows that even the direct application of enough force that sometimes causes an injury, a bruise, is not enough because it's still not a high enough degree of force. Mr. Kedem, you know, our intuition is that often omissions are just as bad as acts, and sometimes hard to distinguish, and certainly it can be murder when there's a preexisting duty of care that you then omit to fulfill. All right. But there are some places where we have gone well beyond that common law rule and imposed a duty of care even for the good Samaritan. So let's take a hypothetical. Someone comes across the streets, sees that the manhole cover is open, doesn't rescue the little old lady who steps into it because this person has animus toward little old ladies. Now, extreme hypothetical. Justice Breyer might be proud. That would be murder in a state with a good Samaritan statute. Physical force, I guess the gravity is, I mean, what more powerful force in the universe is there than that? Would that, in your view, fall within the government's understanding of what would qualify as the application of violent force? It would have to. The government's view essentially is any time you have a bad result, you know that there must have been violent physical force, which means that not only would the death or other injury in your example be violent physical force, it would also be involved in literally every death since the beginning of time because in every death something bad happens because you either are injured or run out of the cellular inputs necessary to sustain life. And if I might just ask a slightly different question. This is one that, yeah, I don't know of any more powerful force in the universe than gravity. But I wonder whether this statute is divisible between acts and omissions. And that isn't something either side explored. I know it won't help your client. Okay. But perhaps I welcome your thoughts on whether you think this statute is in fact divisible. So this statute is not. We have opinions from the Court of Appeals, New York's highest court, saying that the statute can be committed either by affirmative acts or by omissions, including pure omissions. So we have the Wong case where there were two caregivers, one of whom shook the child, the other of whom failed to render aid. Yes. And they're duty of care cases, classic common law duty of care cases. So you have to prove a duty and then the failure to fulfill it. That's right. Very different than killing somebody or ordering a hit on somebody by act. I mean, giving them a pistol and a brown paper bag is a little different. It is. Presumably if the government thought that this statute was divisible, they would have argued it. But I think your question really highlights an important point, which is it just so happens that this murder statute can be satisfied either by acts or omissions. But the government's argument would have to be the same even if New York had a murder by omission statute that could only be satisfied by a pure omission in which there was no act us reus whatsoever other than just having a duty that you failed to satisfy. And the government's argument would have to be in every single instance of that murder by omission statute, violent physical force was involved. And I take it your argument is that when we look at the federal statute and its definition of crime of violence, that really what is at issue here is the conduct of the defendant. That's correct. That it's not whether force is operating in the universe to achieve a certain result, but the plain text here seems to suggest that we're looking for use, attempted use, or threatened use of physical force. And that at least the common sense view of that is that it's the defendant acting to use, threatened to use, or attempting to use. Is that the thrust of your argument? It is, Your Honor. And I would emphasize there are lots of criminal statutes, including in 924, in fact, even in 924C, that focus on outcomes. So subsection C-5b applies a heightened penalty if death results. The elements clause, by contrast, is, as you've described it, focused on the method, a particular way of committing an offense that Congress associated with armed career criminal behavior. And some of the I take the point that ordinary understandings of what it means to use violent force might not cover omissions, but so, too, it wouldn't cover poison. And we have said that it does cover poison. So we're not really operating in a world in which it's completely sort of ordinary Joe understandings of the phrase? So respectfully, Your Honor, I agree poison is sort of the outer limit, but I do think the Court was making a point there, which is that in response to the defendant's argument in Castleman, that essentially you had to apply the force directly in order for it to count. The Court said, no, if you put poison in tea, it's very much like pulling the trigger of a gun. It's a gentle pull of the trigger. That's not the violent force. The violent force is later when the bullet makes impact. But still, in both of those instances, you're still doing something to bring the victim into contact with that force, which may be wholly absent in the case of a pure omission. You're still using something. You're still using actively. You're still using actively. I'm glad if instead of putting poison in, I knew that there was something in the refrigerator which had gone very bad and it was completely toxic. And I said to my worst enemy, why don't you eat that cake in the refrigerator? Where does that fall on your, in your, you know, what side of the line? That sounds a lot like the food in the fridge is poison and you're just tricking them into consuming it. Correct. And so? And so it would count as a use of violent physical force. Even though now you haven't done anything, really. Well, respectfully, you have taken some step to bring them into contact with it, without which, if you hadn't taken that step, they wouldn't consume what was in the fridge. Well, I mean, in any of these cases, including in the supposedly pure omission cases, we can find some step. I mean, when you're withholding medicine from the ailing person, probably there's some step that you've taken that prevents the ailing person from getting that medicine herself. Or, you know, there's some step that you've taken to put yourself in a, in a position of duty to that person. I mean, there's always something that we can look to. If you're going so far as to say that my telling the person to eat the cake in the refrigerator is an action. So I think you have to ask yourself two questions. One, is there even violent physical force involved? In the instance in which someone expires because they don't have the right medication, usually you would not describe that as involving violent physical force. So if a septuagenarian slips into a coma and then doesn't eat, and as a result dies, no one is going to describe that death as involving violent physical force. So the question is, would you describe it as involving violent physical force because there was someone who was supposed to be there feeding the nutrition tube, but failed to do so? And is that because the context is violent physical force because we're in a statute that relates to firearms that Congress clearly was trying to get at a certain category of person. That's correct. The person who is of the type that they would engage in these kinds of crimes that present, you know, risks of violence in this way. I mean, I thought that was the sort of context. That's right. So all of these hypotheticals about inaction, you know, even though there might be a step or not a step, you know, setting that aside, the point is they're not even in the realm of the kind of thing this statute was about. That's right. We're defining a felony crime of violence. And Congress had a very specific theory. Well, picking up on that, do you – would you argue that your client is not the kind of armed career criminal that Congress was trying to get at when they enacted this statute? We would not argue that, Your Honor. We're focused here on the type of offense. And that's because the elements clause requires an assessment of the elements of the offense and whether violent physical force is present in all instances. Well, the question is whether your client was convicted of a crime of violence, right? That's correct. And some of the – I mean, these are fascinating legal arguments. Some of the people who have come here to hear this case may not know much about the facts of the case. So what was the offense for which your client was convicted? Hiring someone in order to commit a murder. And that, in your submission, is not a crime of violence. It does not have as an element the use of violent physical force. And that's a function of the categorical approach, right? That's correct. It's not – you're not talking about your client. You're talking about the statute. That's correct, Your Honor. Congress had a very specific theory when it wrote the elements clause. It was not aiming for all or even the most serious offenses. It was aiming for a certain type of offense, actively using violent physical force against another, the character of which changes when you add a gun to the mix. But, counsel, we also said in Castleman and Stoeckling that we look at the nature of the crime, and that influences the scope of the interpretation. And so if interpreting the statute a certain way or interpreting violent force a certain way would have the effect of excluding and making the statute virtually inapplicable to most of the statutes in the states, robbery or domestic violence or, so here, I mean, murder? Yeah. So a few points on that. First of all, Stoeckling was an instance where the court was interpreting a common law term of art, force, that made an appearance both in the federal statute and in the state statute. So it made a lot of sense to look at the states to see how they used that term. But beyond that, the court is not convinced, doesn't engage in a sort of nose-counting exercise. And even with respect to states that have murder statutes, it's not as if they're all going to be in or all going to be out. So take New York second-degree murder as an example. It's got five subdivisions. Two of them are already out because of boredom, because they can be committed recklessly. There are two others that can only be committed by an act. And so they're going to stay in regardless, at least as we interpret them. And that leaves just the one under which Mr. Delegate, that served as the predicate for Mr. Delegate. So you think there would still be in many states many murder convictions that would still qualify. It just seems, I mean, you can understand why stepping back, which is, I think, Justice Alito's point to, you know, those observing the argument in the courtroom, to say that murder isn't a crime of violence and will rarely trigger the provision here seems a little counterintuitive. I understand that, because if you were to ask someone, is murder a crime of violence, they would say, of course, in the vast majority of instances, the way you commit murder is going to be violence, which makes it a perfect fit for the residual clause. The idea that under the residual clause But you think that Congress thought it was only covered by the residual clause and that it wasn't an elements offense, murder? So I think that if Congress wanted us to do this sort of as a category assessment, it would have enumerated murder the way it did for some other offenses. Instead, what it said is, we want you to look at whether the element of the offense involves the use of violent physical force. Because, again, if you add a gun to that sort of offense, so robbery offense, for instance, robbery is obviously dangerous enough, but when you add a gun to the mix, the danger goes up exponentially. It changes the character. Same is not true for an omission offense. Obviously, omission offenses can be horrible and can be punished severely, but you don't change anything about it when you add a gun. And so it's not the sort of armed career criminal behavior that Congress was aimed at. And didn't Congress really home in on this? I mean, you talk about at least some of the legislative history for the Criminal Code Reform Act in 1981, and I was struck by a particular example in a report that Congress, the Senate report, where the report talks about a dam operator who threatens to refuse to open the floodgates during a flood and thereby places residents' lives in jeopardy. And the report says, quote, assuming the operator had some legal duty to act, his threat would be to engage in unlawful conduct dangerous to human life, which is not a crime of violence, since he did not use or threatened to use physical force. So it seems as though we had examples in the record that Congress was aware of omission and made pretty clear that when you don't act, you know, you're not threatening to use physical force in the way that they intended. That's correct. It's remarkably specific. And I understand that not all members of the Court are taken with legislative history, but we can rely on it just as a sort of contemporaneous use of the relevant terms in context. One of the most remarkable things about the government's brief is that they haven't identified a single instance, and they looked high and low both in published opinions and also in news articles. Every single one of their examples was someone who had used something actively, not passively, not the sort of passive benefit theory. They were described as, for instance, NASA using the moon's gravitational field by shooting a rocket up into space and then aiming their satellite at the right point to make contact with the moon's gravitational field. This idea that you can use something just by passively benefiting from it, the government wasn't able to identify a single real-world instance of it in contrast to the one that you've just identified, Your Honor. How about I used the rain as an excuse to stay indoors? So I think, first of all, you can use the rain in that sort of conceptual sense. It's very different from using something in a physical sense, like physical force. And even in that instance, you don't have the against another or against the person or property of another phrase, which also is a sort of physical phrase. Again, in the government's brief, they don't identify any instance other than one that they make up themselves that uses use and against another in combination. And the example they come up with is, he used the victim's disease against her. But there, it's against her interest, not against her person. So, again, the government presumably spent a lot of time trying to come up with this passive benefit sense of use in combination with against another. And if this is all that they can come up with, I think we can conclude it's not a normal way of speaking. In most of our cases where we've talked about what use is doing in this phrase, we've talked about it as a requirement of mens rea. In other words, to use physical force means to have some understanding in your head of what that physical force is supposed to achieve. So we haven't suggested that it really adds to the physical force language with respect to the actus reus. So I think that's correct, but let me just sort of trace it through, and I think it actually comes out where we're asking you to. So the first appearance of interpreting use in 924C is in Bailey, where the word use is in combination with a firearm in C-1. And the Court looks at dictionary definitions and say they imply action and implementation, and it adopts an active employment sense of the word use. And it rejects the government's argument that you can use a firearm, even if it's just stashed in the closet, because you derive some benefit from it. So it's an actus reus interpretation of the word use. Then that was ported over to an elements clause in Leocal and then again in Borden. And you're right that Leocal and Borden were both about the mental state, but they adopted wholesale the active employment sense of use. And that active employment sense came from what Bailey said was the ordinary meaning of the term. So unless somehow they ported over just the mental state part of active employment, even though mental state wasn't at issue in Bailey, then I think you bring the whole thing along with it. If we adopt the government's view of use as not being personally employing some instrument, but allowing the laws of physics to take their course, what was the point of us deciding that this statute is different than the domestic violence situation? Sure. Aren't we just back to that? Yes. Because anybody who wishes to use the laws of nature to harm another is convictable and I mean this is just a statutory enhancement. Your client is going to spend a lot of years in jail. This is just how many much more? How many more? That's correct. Yes. So and I think there are some pretty... And we don't really care about your client here, do we? Well, I can't... We're trying to get the law right. I wouldn't presume to speak for you, obviously. We do care about the extra 60 months that he would spend in prison. That's what we're talking about. How many years is he already spending? So regardless of the... Separate and apart from the C-3B conviction, it's 240 months. All right. Back to my question. Yes. So the domestic violence statute, very briefly, had a very different function, which was to close a loophole that made it lawful for certain misdemeanor offenders to possess a gun. And the court was concerned that if it read the clause narrowly, it would render that provision inoperative in a number of states. Here, there's no dispute that obviously murder is going to stay very illegal everywhere, and our reading would not render the elements clause inoperative in any state. Thank you, counsel. Justice Thomas? Are you really talking about your... Oh, that's okay. Thank you. Are you really talking about your client? And we make this distinction between action and omission. Are we talking because we're in the world of theory now? We're not really talking about what your client did, as Justice Alito alluded. That's right. We're here as a consequence of invalidation of the residual clause. So would your case be different if we did not use the categorical approach? I suppose it would, but although this court has considered abandoning the categorical approach for the residual clause, and at least one justice has for the enumerated offenses, I'm not aware that any justice has considered it for the elements clause, because it requires as an element the use of violent physical force. But I mean, I think it's fair to say, though, that we are discussing something that bears no factual relationship to your case. So I accept that, Your Honor, and would respectfully suggest you essentially take the position you did in Borden, which was to say whatever it is, criticism about the categorical approach, but then to give the elements clause its natural meaning. Justice Alito? Justice Jackson? I mean, Justice Barrett? Thank you, counsel. Mr. Fagan? Thank you, Mr. Chief Justice, and may it please the Court. It's hard to believe that we're actually here debating whether murder is a crime of violence, as I think Petitioner just acknowledged. This is one case where the law already tracks common sense. Castleman tells us that internal force, like a disease, can be physical force. It also tells us that physical injury must result from physical force, and the Borden plurality recognizes that someone uses force against the person of another when he makes force his instrument to cause that person harm through force. I used force twice there, but I think you get the point. And there's really no basis in law or logic to draw a distinction between the person who gently holds the victim just withholds the antidote. By urging that distinction, Petitioner is asking this Court to discard literally two millennia of common law that treat acts of omission just like other acts. He's asking this Court to cut out any number of canonically violent murder, robbery, and assault offenses out of 924C. The definition of violent felony under the Armed Career Criminal Act and the definition of misdemeanor crime of domestic violence is relevant to 922G9. And he would make all three of those statutes, he's asking this Court to make all three of those statutes turn on distinctions so arbitrary, unprecedented, and bizarre that it would make application of those statutes, again, Your Honor, I use this word with respect, truly absurd. I would like to address a couple of his points, but if the Court has questions, I realize my light just flashed. Mr. Fagan, we normally think, though, of force as coming from the perpetrator, not from some outside force, like gravity or some internal disease. So how do we get from where you are to where he is? I think his argument actually does make, does have a common sense value to it. Well, Your Honor, I think as Castleman demonstrates, we know that whatever force causes death can be an internal force. It can be the action of whatever action within the body is induced by poison. We also know from Castleman, one of the examples it uses is a disease. So the actual death-causing force can be a purely internal force. If I know you have a weak heart and I frighten you and you die, your body is attacking itself. That's also true if you intentionally and torturously starve a child. That's, the starvation causes the body to attack itself. It starts eating itself away because it has no other source of nourishment. If you're asking me about whether that force has to be in some way, I think the words Petitioner uses in the brief are unleashed or channeled in some way by the defendant, I think that's somewhat of a gerrymandered requirement. He's trying to do it to catch things like, you know, the wind catches your sail, or the example in our brief where you're involuntarily placed on a raft, you see which way the current is going and you use the current to get you to shore without doing anything. But that channeling requirement is equally satisfied in an omission case, where you can stop it, the force is going to occur. You can stop it, you should stop it, and you don't stop it because not stopping it accomplishes your purpose. Mr. Fagan, on that score, if we're going to talk about common sense, and that's a good place to start sometimes, your view, I think, would capture the Good Samaritan example as well and make that subject to an additional enhancement under ACCA, right? I don't think that's necessarily true, Your Honor. Why not? Just to set the table again, we have somebody, a passerby on the street who doesn't like little, little ladies and intentionally allows someone to fall into and die, and the physical force, your view is gravity is good enough, I don't have to push her, and now that would depart from the common law where there's normally a duty, a pre-existing duty, but here we have a Good Samaritan statute. So that is an ACCA offense in the government's view, and why wouldn't that defy common sense? Not necessarily, Your Honor. Let me explain why I'll take just one second to unpack this. It turns on what, it turns on how you interpret use of physical force against the person or property of another. Yeah, but you use rivers and currents, and what's wrong with gravity? Gravity is fine. It's the problem of your postulating that some state has some kind of aberrant duty. Oh, no, it's not aberrant. Some states do, and many in Europe, have good Samaritan laws that impose affirmative duties that didn't exist at common law. We think that in order to use physical force against the person of another, there has to be, number one, a deliberate choice. Sure, I got that. That's what the Borden plurality tells us. And two, the common definitions of use, like avail oneself of, we do think have an element of causation in there. Yeah, no, there's no doubt that my failure to act caused this person's death. I've got causation and I have intention. I have mens rea. Now, I understand that when there's a common law duty, our intuition is that that's really bad. When a parent doesn't feed a child, when a doctor doesn't care for a patient, that's problematical. I'm testing how far, and I don't see what line you would draw between that and a good Samaritan statute, which again, many states have. So causation includes both cause and fact, which we have here, and proximate cause. And I think the proximate cause inquiry as... Let's say I have that box checked, too. Well, Your Honor, I think where we part ways is, I don't think I necessarily think you have that box checked in your example, and here's why. The proximate cause that's built into the statute here, I think, can be informed by the common law of duty as of 1984. No, no, no. Again, I have a statute that's a good Samaritan statute that imposes a higher duty on ordinary people to be good Samaritans, and so it creates a proximate cause test that's different from a common law test. You're just resisting the hypothetical, and I can understand why, because the consequence of your interpretation has its own common-sense problem. It can capture all omissions cases, wherever the duty comes from. With respect, Your Honor, if I could just explain. I don't think I'm resisting the hypothetical. I think I'm just explaining that, as we normally do in interpreting these kinds of statutes with the categorical approach, there is some concept of generic federal law, and here, what federal law might mean by use, its concept of proximate cause would be informed by the common law scope of duties as of 1984. Where does that come from? I didn't see that anywhere in your brief. That's new here at the lectern. Where does that come from? Well, Your Honor, I think that's just how we've been interpreting these statutes. There's always – it's always a question of federal law. The term use depends upon common law duties in 1984. Well, Your Honor, we think use – Has any court ever said that? Proximate cause requirement.  It hasn't – Your Honor, it hasn't come up, because until the Third Circuit – Right, but will after this case. Mr. Fagan, can I ask you, just piggybacking on what Justice Gorsuch is saying, I guess I'm just trying to understand the government's position on what it means to use physical force against the person of another in an omission case. So let's take this hypothetical. Say you have a lifeguard, and she has a duty of care to rescue children in the pool. A child jumps into the pool entirely of their own volition. Is it your position that she uses physical force against this kid if she doesn't jump into the water when she sees him drowning? Yes. Okay. So how can that possibly be? I mean, you're saying she uses physical force, and that means no action but an intention that this victim succumb to a harm that she didn't put into place, that she had really nothing to do with, but she sees it happening? So Your Honor, she is using physical force against the person of another because, again, she could stop it, she is legally required to stop it, and she doesn't stop it because she wants the victim to die. And to use a dictionary definition – So it's only her mental state that is doing the work of her using physical force? No, Your Honor, it's the combination of those things. Under just a plain dictionary definition of use, she has availed herself of the force, she has had enjoyment of the force, she's made the force her instrument to accomplish her purpose. All right, let me ask you about the other parts of the statute, the attempt and threaten. Same situation. How does it work in an omission case for this lifeguard to threaten the use of physical force against this kid? Is it because she says something to him that would make it a threat? Like, I don't understand how omission works with respect to the rest of the statute. Well, Your Honor, if I could depart from the lifeguard example where it might be – No, no, I want the lifeguard example. You want an example – I want to ask you, in the lifeguard example, if she says, hey kid, if you get into the water but can't swim or start to drown, I'm not coming to get you. Is that a threat of use of physical force in your view, or how else would you accomplish the threat part with this? Well, two points, Your Honor. Number one, I think if that were generally considered a threat for purposes of the substantive statute that the person also has to violate under state or federal law, then perhaps that would be the threatened use of force. But it's easy to see threatened use of force in omission cases and other examples. Suppose you're the caretaker for an old, sickly man, and you tell him, look, I'm not going to give you your medicine today, and you're going to die, unless you give me the combination to that safe over there where you keep all your gold bars. That is threatening in omission. I think everyone would consider that threatening in omission, and it's – But is it a crime of violence? I mean, this was the point that Justice Gorsuch, I thought, was making before, that you may have culpable conduct under the law, but what we're looking for for the purpose of this enhancement is violent conduct, violent criminal conduct. And I guess what I'm worried about is the government's interpretation that has lifeguards and caregivers and people who very intentionally and perhaps even criminally withhold their duties actually being put in the bucket of violence, even though they don't act. Well, Your Honor, if you look at page 550 of the Court's decision in Stoeckling, you'll see one dictionary definition of violence that defines it in terms of the causation of physical harm. And in these cases, I mean, let's not lose sight of it. Someone is using harm. But they're not using, Mr. Fagan. I mean, my problem is I don't understand how you get use to inaction, how you get use out of inaction. So, Your Honor, maybe a few examples. He accuses us of having no examples. I think if you look at our brief, you'll see a number of them. But let me give you an example that comes basically straight from one of this Court's own opinions, which is let's take a look at the Borden plurality again. Borden plurality has an example of use of physical force against the person of another when someone is driving a car, sees someone come in front of them, and keeps, in the Court's words, plowing, sorry, plurality's words, plowing ahead and hits them. Action. Action. They're moving. Well, Your Honor, this is all just a game of, I think this is what one might describe as just sort of a terminological word game. I mean, when you answer these questions, Mr. Fagan, are you thinking about the use of physical force as an ordinary meaning kind of question? Or are you saying it has a specialized legal meaning? I think it's an ordinary meaning that's informed by the common law. So, Your Honor, to the ordinary meaning point on the Borden plurality example, I could easily describe that conduct as simply omitting to hit the brakes or omitting to turn the steering wheel. And then we'd say you're playing word games. I mean, because I think when you push your foot on the accelerator and drive your car into somebody, that's not really such a hard case. But some of these are hard cases, like the lifeguard example, where we would say, you know, the lifeguard is just sitting there. And this is not like what a normal person would think of as a use of physical force. So it's almost as though we have to pick our absurdity. You started with one absurdity. We would say that murder is not a crime of violence. That seems pretty absurd. But here's another absurdity. The lifeguard is just sitting up there watching somebody is using physical force. That seems pretty weird, too. So, Your Honor, I think your two questions, as Your Honor probably recognizes, really pair together here. And the reason that we have two millennia of law that don't draw this distinction is precisely because it is a word game. If you look at, for example, the Hall Treatise that we cite, that's from 1960, but still substantially predates the ACCA. Or you even want to go further back, and you look at the 1875 Warden Treatise, you'll see that the Warden Treatise, for example, in Section 72 says even sleeping can be an affirmative act, and it can lead to liability when there's something you're supposed to be doing, but you're not doing it. And the common law sources that we cite, both Hall and Territory Against Manton, which is an 1888 case, have no trouble describing those kinds of omission cases as involving the use of force. Counsel, I'd like to get back to the lifeguard also. You say the force she was using, the force of gravity. And was she using it before the child jumped in the pool? I know, Your Honor. So she did something that suddenly gravity was there? Well, Your Honor, what happened... First of all, I don't think the force here is the gravity. I think the force is whatever happens within the body to... I mean, you can conceive of it in a number of ways. It could be the force of the water. It could be the gravity. It could be as... What is the force of the water? I mean, I don't know if she... I guess the pool is probably not deep enough for her to get crushed in it, but the gravity is dragging her down in the pool. There's an internal process going on in her body whereby her life is sucked away from her. I apologize, I'm not a doctor. I couldn't quite tell you what happens with asphyxiation, but the body's going to be attacking itself there, gasping for air, eventually die. It's the same thing Justice Kagan said. The lifeguard's not doing anything. Well, Your Honor, to your specific point, I could easily reframe it as the lifeguard withholding from the lifeguard's duty to rescue the child. And if you think of the... I mean, again, I think this is easier to see, and I'll translate the lifeguard example in a second, but easier to see in the Borden car plowing ahead example. I mean, if I just... The car plowing ahead is different than the lifeguard doing nothing. Well, I don't think... Well, okay, Your Honor, I think the lifeguard is using the force there, because the lifeguard is using some physical force that causes the victim's death, and the lifeguard wants the victim to die. The lifeguard is availing... The lifeguard wants to get to all that that's beside the point. Your submission is that somebody who's just sitting there is using force, the force of gravity and the force of the water. Yes. I mean, under a plain definition, he's taking advantage of the force. He is availing himself of the force. He's enjoying the force. He's making the force his instrument. But he's not doing anything. Mr. Fagan, if I might just follow up on this. Is there any death that's intended and caused by somebody doing nothing, like our lifeguard, that wouldn't involve the use of violent physical force, because every death is going to be affected by gravity or water, and the body will fight itself in your terms? I mean, that's how death occurs, I guess, in the government's view. Your Honor, to answer your... What death wouldn't qualify? So to answer your specific question, I don't think every death involves someone using physical force against the person or another. Well, if the lifeguard can do it. But I do think that every death does involve physical force. The physical force requirement... Every death involves physical force, and why wouldn't it all be violent? Because it's all extremely unpleasant. We do think every death involves physical force and violent physical force within the meaning of Curtis Johnson. Not all of them are going to satisfy this statute. They're all violent physical force, though. Because not all of them are going... Yes, Your Honor. All right. I got another question for you. I got it. I got it. Sorry, can I add? Sure. I'm sorry. I just wanted to add the point that the physical force requirement of the statute is not to carve out things like murder and physical harm. It's to carve out, like, property crimes, fraud, that sort of thing. All murders are, by definition, the use of violent physical force, I think. I think it has to be. Subject to the proximate cause caveat I was discussing with you earlier, Justice Gorsuch, yes. And the mens rea. That's going to be right. And the mens rea, of course, that I also mentioned at that time. All right. It's kind of a little strange to think that Congress meant by this, if we want to talk about common sense, that every death is encompassed, so long as I can meet mens rea and causation. But put that aside. I really think you're struggling, if I'm honest with you, to try and defend a position that just has nothing to do with this case, right? We've got a defendant over here who ordered a hit job. I mean, that's what everyone's, the common sense on your side. And handed them the gun. And handed them gun and a paper bag and the whole nine yards. It's like out of a movie. And here we are talking about lifeguards and omissions. And it makes me wonder whether, again, as I asked your friend on the other side, anybody considered whether this statute might be divisible? Because traditionally, traditionally, murder statutes encompass two very distinct things. Acts. Ordering the hit job. And omissions where there is a pre-existing duty of care. Very different. Does that resonate to you at all? It might help you. Yeah. Your Honor, I think we might make divisibility arguments with respect to some statutes, perhaps including this one, if the court were to rule against us. Obviously, we won in the Second Circuit and we didn't make a divisibility argument because we were already... If that's the case, maybe we go back to Justice Kavanaugh's question from the last case. Why wouldn't we remand this to ask that we resolve that first, before we start talking about lifeguards and every murder being encompassed within this? Well, Your Honor, I think this is going to come up in any number of cases, whether or not the court resolves it here. Because as we point out in our brief, 35 states by statute include omission liability. And one common way to do that is just to define the word act to include omissions. That's the way New York does it. Omissions plus duty of care is what they do.  And so, again, if you won here, you'd have a great precedent that maybe that some of the others would be divisible too. I would have thought that would have been useful to you. Well, Your Honor, we did not make that argument below. I know that. It's a state law argument that we don't think is appropriately made in this court. And we do... I agree with that. What would a divisibility argument as to this statute look like, if I can ask? I think we would probably be relying on cases, and New York has some, where because omission liability, as Justice Gorsuch just pointed out, requires a duty as well, there are cases where the jury instructions, for example, were found deficient because they didn't specifically allege the duty. But there are cases, and there are a couple of examples of them in the briefs, where something like horrific child neglect and also beating a child are kind of charged together. So I think the outcome of that would be a little bit in doubt. And that's actually the only reason why we've said that all the statutes listed in our appendix are just at risk. It's the same thing the court said in Voisin. They're at risk because we're not quite sure how the divisibility analysis is going to shake out. But there's no question that we've already lost in the Third Circuit. There's no question that that's going to affect charges under the hate crime statute in that circuit. It's going, and we think if the court were to rule against us, it would affect charges in the hate crime statute. In other cases, the Buffalo supermarket shooter has raised this very argument and preserved it. And if we lose it here, then the hate crime statute is not a crime of violence, killing somebody because you are biased against their race, because it could possibly be committed by the conduct of being a daycare worker and realizing that there's a bomb in the building and deciding you're only going to save the children of one right. So are you fighting the categorical approach? I mean, isn't that the root of your problem? And I guess, I mean, the divisibility argument has a lot going for it. But is it, how does it fit with the categorical approach? Your Honor, not every statute is going to be divisible by act versus omission. It's very common to define act as, define it by omission. That's the model penal code definition in section 1.137. But as to fighting the categorical approach, we had that fight a few years ago and we lost. So I am no longer fighting the categorical statute. Well, I just wonder if you're trying to get in the back door. No, Your Honor. The point I'm making is I think there's, I think that approaching this with some sort of degree of common sense that is here informed by two millennia of common law and foreseen looked at the common law to a certain extent in interpreting what the term use meant. The other side says that the common sense is really captured by the residual clause. Your Honor, let me make several points about that. And let me just finish. And the residual clause, of course, in Johnson and Davis was declared unconstitutional. And now the other side says what you're, and by the way, it was pointed out that that would lead to absurdities. And here we are. And that you're trying to jam cases that would have naturally fit under the residual clause into the other clause. So that's what the other side is suggesting. If I could have a second, several points on that. Number one, I think he's trying to have it both ways. He's arguing that Congress wouldn't have wanted this to be a crime of violence at all. And he's relying on this residual clause argument. As to the residual clause argument, this isn't a case about potential risks, which is what the residual clause covers. This is a case where we know somebody dies. I think the Court has not relied on the residual clause in other cases where it might have equally been applicable under the kind of logic you're suggesting, Justice Kavanaugh, like Stokeling. I think that's because everyone recognizes the has its own specific function. I'd also point you not just to 924C3's residual clause, but to the Armed Career Criminal Act's residual clause, which is worded a little bit differently, although no one thinks it affects the scope of the elements clause. It requires a serious potential risk of physical injury. I don't know who could think that that's the way you're capturing murder. It doesn't have a serious potential risk of physical injury. Somebody gets harmed. And then finally, I just want to point out that Section 922G9's definition doesn't appear there. That's in Section 92133A. The definition of misdemeanor crime of domestic violence doesn't even have a residual clause. And if you look at the appendix we submitted in Voisin, most of the assault statutes the Court was worried about there are defined in terms of harm or causation of offensive touching. Thank you for your indulgence, Justice Jackson. Yes. No, Mr. Fagan, I appreciate that somebody died here and that we would ordinarily think of murder in that situation. But it's clear that the language of this provision of the statute is not focused on the outcome or the effect. And I think the common sense reading of this that cuts against you is the fact that physical force has a common sense meaning, use has a common sense meaning, and that it suggests that the defendant has to act, that they have to do something. And so Justice Gorsuch's point about divisibility is kind of my thought, which is at the beginning of this, it seems like we have a bifurcation of Congress's view that you have action by a defendant and you have omission in a different column. And we're sort of in the realm of action. So I guess my question is, how could Congress have possibly written the words use, attempted use, or threatened use of physical force and meant that the defendant doesn't have to do anything at all? Well, Your Honor, this goes back to the common law backdrop against when I think the easiest way to see that, that there's some linguistic ways to see that to dictionary definition. No, I'm just looking at the text of the statute. If you're right, that what Congress was trying to capture with this is a victim dying or a person being bodily, injured bodily. Congress has said that many other places, even in this very statute, when that was the triggering thing. What I'm worried about is interpreting the words use, attempted use, and threatened use of physical force to encompass a situation in which a person is not acting. That seems completely counterintuitive. It seems like it has no bearing in the words of the statute. I've already talked with your friend on the other side about the legislative history that actually shows that Congress wasn't talking about omissions. But how do you get past this sort of conceptual concern that we're really talking about doing something here and you're suggesting that you don't have to? Well, Your Honor, if I could respond, I would have like three principal points in response to that. One of them is the premise of your argument, not argument, the premise of your question was that this statute doesn't look at results. But I'd respectfully point the court to Castleman and as well as Justice Scalia's concurrence in Castleman, which both point out that where you actually have physical injury, it must have been caused by physical force. But Castleman was dealing with a different question, like how much force, what is force, is putting the poison in the drink enough to be physical force? I'm talking about a situation in which a person does nothing. Okay. The second point I'd make, Your Honor, and I've been trying to make it this morning, and I take it as part of your question, you've kind of rejected this. But I do think it fits squarely within dictionary definitions. Again, if my car is just rolling down a hill and I see some, my enemy walk in front of me and I let the car keep going and just don't do anything, I think we'd all say I used physical force. Now, maybe I got in the car and turned the key and started the car, but I certainly didn't have the intent to use physical force against the person of another. I only had it at the point I stopped doing something. And the third point I'd make, if you'll indulge me one second longer, Mr. Chief Justice, thank you, is that I don't think this would have defied common sense because, again, if you look at all the common law sources, everyone recognizes this is a word game. Do I call it withholding? Do I call it not acting when I refuse to give someone medicine? And the common law is always treated doing something other than what you're supposed to do, fiddling while Rome burns, as an affirmative act. Thank you, Mr. Chief Justice. Thank you, counsel. Justice Thomas? Justice Sotomayor? Justice Barrett? Justice Jackson? Okay. Thank you. Thank you, counsel. Rebuttal, Mr. Keenum? Thank you, Your Honor. Starting first with divisibility. When this Court has asked whether a statute is divisible for purposes of the categorical approach, it is asking whether it is linguistically divisible, whether the text of the statute allows it to be divided into separate offenses. Sometimes there are a list of different ways of committing an offense. Sometimes they are different offenses. So you could say that burglary involves breaking into a house or a houseboat or whatever, and then the question is, is house a different crime than houseboat? But it has to be linguistically divisible. You don't look at — and you can look at State common law or otherwise to figure out whether those are different elements or means, but you don't look at case law generally to ask whether omissions are different offenses than not. That is what my friend is asking you to do, something this Court has never done. And at minimum, if you're going to start to engage in that kind of divisibility in an entirely new realm, I would think that you'd want a case where that issue had been raised and briefed. My friend also said that essentially the only question about whether all the statutes in its appendix are out is a question about divisibility. We respectfully disagree. States can agree with the general principle, as I think all of them do, that omissions can sometimes be liable. They can accept the common law principle but still believe that certain specific offenses cannot be committed except by affirmative acts. We have cases in our brief, in our reply brief, in, for instance, Louisiana, which accepts the general principle but nevertheless says that felony murder cannot be committed except by an affirmative act because it is written in a way that requires a killing. And so you have a number of those statutes, even in those effective States, that wouldn't necessarily be excluded. Going to the residual clause, the residual clause is a natural home for offenses like murder, not because murder isn't always bad, but precisely because it is usually bad. In other words, the vast majority of murders are, in fact, violent, which is why it makes sense to fall under a clause that talks about the risk in an ordinary case that physical force against another will be used during the course of commission. It allows for these sorts of edge that we've been talking about. The elements clause is not written that way. It requires the use of violent physical force as an element, which means in absolutely every case. And my friend does not dispute that there is no interpretive significance to the fact that the residual clause is no longer operative. Going to the word use, my friend says that use derives some meaning from the common law. This court in Bailey said use must be given its ordinary meaning, which is active employment. And you notice that when my friend started talking about using things like metabolism or the body's natural processes, he lapsed into this sort of abstract concept speak, rather than talking about something physical, like physical force that you use against the person of another. Castleman. Castleman examples are all indirect force. Poison, pulling the trigger of a gun, introducing a disease by which I think the court meant if you infect someone with the Ebola virus, obviously that's an indirect use of violent physical force. But they're all taking steps to bring someone into contact with the thing, without which, without the step you take to bring them into contact with it, there would be no harm whatsoever. So it's not a word game. Whether you describe, you know, failing to feed someone as an act of withholding or an omission, either way, you are not bringing them into contact with any force, much less violent physical force. My friend relied very heavily on the common law, as the brief does as well. He says that acts of omission are treated as other acts. And that, as a general principle, makes sense for liability. But the problem with the government's argument on that is none of those terms make their appearance in the elements clause, which talks about the use of violent physical force. That's the thing that has to be present in each case. And that's why, to your question, Justice Barrett, Stoeckling is different, because it was interpreting a common law term of art, which appeared both in the federal provision and in the state provision. We're not here interpreting words act or omission. We're interpreting use of violent physical force. Finally, I want to end with a point about all these hard examples. You posed a lot of very difficult hypotheticals, both to me and my friend from the government. And the thing is, you don't have to agree with us on essentially any of them, except the pure omission scenario, where there's an octogenarian who falls into a coma and slowly expires because they are not being fed nutrition. No one would describe that as a death involving violent physical force, except for perhaps the government, which thinks that literally every death involves violent physical force. But if that, in a sort of normal scenario, is not a death involving violent physical force, it doesn't suddenly become violent physical force because there was someone who had a legal duty to provide that nutrition. It may be a very serious crime. It can be punished severely, but it does not categorically involve the use of violent physical force. Thank you. Thank you, counsel. The case is submitted.